**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| NICOLE MARIE SWIGER, *on behalf of herself and all individuals similarly situated,* | Civil Action No. |
| Plaintiff, | |
| v. | |
| JOEL ROSETTE, TED WHITFORD, TIM MCINERNEY, and KENNETH E. REES, | |
| Defendants. | |
| | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

## FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

## AND FOR QUO WARRANTO

COMES NOW Plaintiff, Nicole Swiger, *on behalf of herself and all individuals similarly situated*, by counsel, and for her Class Action Complaint against Defendants, alleges as follows:

### INTRODUCTION

1.      This class action challenges the usurious loan practices, involving interest rates starting at 354%, which target the most necessitous and least sophisticated borrowers in a scheme concocted by a predatory lender to evade state and federal regulations by using the Chippewa Cree and Otoe-Missouria Tribes as conduits for their loans..

2.      The basis of the scheme involves a "rent-a-tribe enterprise" that was established by Think Finance, LLC and its principal, Kenneth E. Rees, to evade federal banking and consumer finance laws and state usury and consumer protection laws.

1

3.      Even though regulatory enforcement efforts and private lawsuits uncovered their misconduct as early as December 2014, Think Finance and others continued to engage in the scheme even though "[n]o one appear[ed] to seriously dispute" that these rent-a-tribe "loans violated a host of state and federal lending laws." *See Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 669 (4th Cir. 2016).

4.      Under the rent-a-tribe model, loans were made in the name of Plain Green, LLC—an entity formed under the law of the Chippewa Cree, a federally recognized Indian tribe centered on the Rocky Boy's Reservation in Box Elder, Montana, to serve as the front to disguise Think Finance's role and to shield the scheme from application of federal and state law by exploiting tribal sovereign immunity.

5.      Since its creation, Plain Green has engaged in and continues to engage in a series of predatory loan practices that violate the law and that have injured numerous people who are struggling financially.

6.      In return for use of their agency, the tribal companies receive a nominal flat-fee from loan revenues, but otherwise have at most nominal control over the income, expenses, or day- to-day operations of the loan enterprise.

7.      Defendants Rosette, Whitford and McInerney are the officers of Plain Green, LLC, who are sued here in their official capacities under the legal principle established in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), because, while Plain Green, LLC arguably enjoys sovereign immunity from suit, its officers and agents do not share that immunity.

8.      Defendants Rosette, Whitford and McInerney personally participated in and oversaw the illegal lending enterprise, rendering them personally liable to consumers.

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522JFWRAOX, 2018 WL 485963, at *11 (C.D. Cal. Jan. 19, 2018) (finding the president and chief executive officer of a rent-a-tribe lending business liable for a $10.2 million-dollar judgment because "he directly participated in and had the ability to control" the deceptive acts).

9.      This lawsuit seeks to hold Defendants accountable for violations of federal and Michigan laws in the marketing, making, and collection of loans with criminally usurious interest rates.

10.     Plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961-1968.

11.     Defendants received millions of dollars derived from the collection of unlawful debt.

12.     Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(a)-(d).

13.     Plaintiff also asserts a class claim for violations of Michigan's usury laws and unjust enrichment. Because the interest rates on Plain Green's loans exceed 25% annual percentage rate ("APR"), such loans are unlawful and neither the lender nor any third party may collect, obtain, or receive any interest, official fees, delinquency or collection charge, attorney fees or courts costs, M.C.L. 438.32.

14.     Accordingly, Plaintiff and the class members seek to disgorge all amounts paid by Michigan consumers in excess of 25% interest, plus their attorneys' fees and costs per MCL 438.32.

<u>**JURISDICTION and VENUE**</u>

15.     This Court has subject matter jurisdiction on the following bases:

A.  diversity of citizenship exists between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000[1]. 28 U.S.C. §1332(a);

B.  this Court also has jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2)(A)[2];

C.  this Court independently has jurisdiction over claims based on federal law under 28 U.S.C. §1331, such as the Electronic Funds Transfer Act, 15 U.S.C. §§1693 *et seq.*;

D.  jurisdiction independently arises under 18 U.S.C. § 1964(c), the Racketeer Influenced and Corrupt Organizations Act (RICO);

E.  the Court has supplemental jurisdiction over state law claims in accordance with 28 U.S.C. § 1367(a) and/or (b);

F.  This Court has jurisdiction and authority to grant a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §2202.

16.        Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as the named

---

[1] Plain Green's financial statements and business records are not publicly available.  However, a *Huffington Post* article published June 29, 2015 and updated December 6, 2017, ("Outlawed by the States, Payday Lenders Take Refuge on Reservations" by Ben Walsh, https://www.huffpost.com/entry/online-payday-lenders-reservations_n_7625006) reported   that "according to documents obtained by HuffPost that were filed in tribal court as part of a case between the tribe's former chairman and other tribal leaders that involves the agreement with Think Finance, the Plain Green's 4.5%-5.5% share of revenues from the lending scheme produced $28-$32 million for the tribe.  With individual loans not exceeding $3,000, as a matter of arithmetic that means, using the $28 million dollar and 5.5% figures, Plain Green made *at least* 169,697 loans as of 18 months ago (assuming every loan was the maximum $3,000; most loans were significantly less, meaning the total number of loans was 3X-6X that number).  The Census Bureau calculated that population of the US as of July 1, 2018 was 327,167,434, of with Michigan's population then being 9,995,915, or  .0305529 of the total population (https://www.census.gov/newsroom/press-kits/2018/pop-estimates-national-state.html, Table  1). Statistically speaking, therefore, of Plain Green's 169,697+ loans as of some date prior to December 6, 2017, the number of loans to persons in Michigan would be not less than 5,193, which at $3000 per loan and 354.14% interest means the usurious interest alone charged to Michiganians amounts to more than $19 million.
[2] See footnote 1, demonstrating that, statistically speaking, at least 5,193 Michiganians borrowed money from Plain Green, far in excess of the 100 class member minimum for CAFA to apply.

Plaintiff is domiciled in the City of Westland, County of Wayne, State of Michigan, which is located in the Eastern District of Michigan, defendants Rosette, Whitford, and McInerney are domiciliaries of the State of Montana (or an Indian reservation located in the State of Montana), defendant Rees and ThinkFinance, Inc. are domiciled in Texas, and the challenged loan transactions were conducted by soliciting plaintiff's business in Michigan through the US mail or by use of interstate communication facilities, such as the internet or telephone, having their terminus in Michigan.  Venue is also proper pursuant to 28 U.S.C. §1965(a).

## PARTIES

17.     Plaintiff Nicole Swiger ("Swiger") is a natural person, and a citizen and domiciliary of Michigan, residing in the City of Westland, Wayne County, which is located in the Eastern District of Michigan.

18.     Defendant Joel Rosette is a natural person, a domiciliary of the Rocky Boy's Reservation, Box Elder, Montana, where Plain Green, LLC is headquartered, and the Chief Executive Officer of Plain Green, responsible for all Plain Green operations under Article 7.6 of Plain Green's Articles of Organization, with authority to "hire and terminate employees when necessary" and thus possessed of authority to prevent and end the credit reporting and unlawful loan-related activities addressed in this Complaint and sued in his official capacity  Rosette is a citizen of Montana for diversity jurisdiction purposes.   *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 n. 10[3],107 S.Ct. 971, 94 L.Ed.2d 10 (1987).

19.     Defendant Ted Whitford is a natural person, a domiciliary of the Rocky Boy's Reservation, Box Elder, Montana, where Plain Green, LLC is headquartered, and a

---

[3] "In 1924, Congress declared that all Indians born in the United States are United States citizens, see Act of June 2, 1924, ch. 233, 43 Stat. 253, now codified at 8 U.S.C. §1401, and, therefore, under the Fourteenth Amendment, Indians are citizens of the States in which they reside."

member of the Board of Directors of Plain Green and Vice-Chairman of the Chippewa-Cree Tribal Council, and sued in his official capacity.  Whitford is a citizen of Montana for diversity jurisdiction purposes.

20.      Defendant Tim McInerney is a natural person, a domiciliary of the Rocky Boy's Reservation, Box Elder, Montana, where Plain Green, LLC is headquartered and a member of the Board of Directors of Plain Green and sued in his official capacity.  McInerney is a citizen of Montana for diversity jurisdiction purposes.

21.      Defendant Kenneth E. Rees is the former President and Chief Executive Officer and current Chairman of the Board of Think Finance, Inc., a Texas corporation headquartered at 7701 Las Colinas Ridge, Suite 650, Irving, Texas 75063; formerly known as ThinkCash, Inc.,[4] He is currently the Chief Executive Officer of Elevate Credit, Inc. Mr. Rees maintains a controlling interest and operational role in Think Finance.

22.      Mr. Rees has personally designed and directed the business activity described in this Complaint. He is a citizen of Texas and not a citizen of Michigan.

## BACKGROUND

**A. Michigan law prohibits usury and provides for strict licensing requirements to protect consumers from predatory and abusive lending practices.**

23.      "Usury is, generally speaking, 'the receiving, securing or taking of a greater sum or value for the loan or forbearance of money, goods, or things in action than is allowed by

---

[4] Think Finance, Inc., before filing for bankruptcy, did business in every state, either directly or through affiliates such as Think Finance, LLC (a Delaware limited liability company), Think Finance SPV, LLC (a Delaware limited liability company), and Elevate Credit, a spinoff of indeterminate structure, and continues to operate under bankruptcy protection.  Elevate's webpage carefully avoids identifying its state of formation or its entity type, but does reveal it is another Kenneth Rees operation with offices in Texas, California, and the UK. https://www.elevate.com/company.html.  It self-describes as "committed to providing solutions for non-prime customers".

law.'" *Hillman's v. Em 'N Al's*, 345 Mich. 644, 651; 77 N.W.2d 96 (1956) (citations omitted).

24.     Usury statutes are enacted pursuant to the state's police power for the valid

purpose of protecting "necessitous borrowers from extortion." *Wilcox v. Moore*, 354 Mich. 499,

504; 93 N.W.2d 288 (1958); *Visioneering Inc. Profit Sharing Trust v. Belle River Joint Venture*,

149 Mich.App. 327, 340; 386 N.W.2d 185 (1986).  As held in *Wilcox v. Moore*, 354 Mich. 499,

504, 93 N.W.2d 288 (1958) (footnote omitted)

> There is no need, at this late date in the law of usury (see Leviticus 25:35-37; Deuteronomy 23:19, 20; Saint Chrysostom's Fifth Homily on the Gospel of St. Matthew; CL 1948, Sec. 438.52 [Stat Ann Sec. 19.12] ) to discuss its rationale. Suffice to say that its purpose is to protect the necessitous borrower from extortion. In the accomplishment of this purpose a court must look squarely at the real nature of the transaction, thus avoiding, so far as lies within its power, the betrayal of justice by the cloak of words, the contrivances of form, or the paper tigers of the crafty. We are interested not in form or color but in nature and substance.

25.     "The usury statute of this jurisdiction, C.L.1948, § 438.51 *et seq*., Stat.Ann. §

19.11 *et seq*., as we noted in *Attorney General v. Contract Purchase Corporation*, 327 Mich.

636, 42 N.W.2d 768, 772, 'is broader in scope than that in many jurisdictions and includes

interest not only on the loan of money or the extension of pre-existing debts, but also on all

contracts and assurances.' " *Hillman's*, 345 Mich. at 651.

26.     As the Michigan Supreme Court noted in *Hillman's*, 345 Mich at 652:

> Transactions allegedly usurious in nature take many forms. Guile is patent in some, observable not in others. Much depends, as we noted in *Continental National Bank v. Fleming*, 170 Mich. 624, 134 N.W. 656, 663, "upon the intention of the lender." The Minnesota court, in *Dunn v. Midland Loan Finance Corporation*, 206 Minn. 550, 289 N.W. 411, 413, expressed the problem in these terms:
>
> > "Whether a particular transaction is usurious is a fact question, where the evidence is conflicting. Decision is not to be made according to any hard and fast test. The case is not to be determined simply by what the parties represent the transaction to be, but by considering the whole evidence to ascertain whether or not it is in substance a contracting to receive usurious interest for a loan or forbearance of money. **The process involves looking through the form to the substance. No**

7

**device or shift may be employed to conceal the true character of the transaction**." [Boldfaced emphasis added.]

27. In accordance with this longstanding public policy, a person who charges an annual percentage rate ("APR") exceeding 25% simple interest is guilty of a felony punishable by imprisonment for a term not to exceed 5 years or a $10,000 fine, or both. M.C.L. 438.41.

28. An exception for corporations, M.C.L. 450.1275, does not apply to Plaintiff Swiger, an individual neither owning nor operating in any corporate form, and would not be available as a defense here even if plaintiff or a class member had incorporated in order to secure a loan from Plain Green because the statute does not authorize a lender to seek the incorporation of household borrowers in hopes of circumventing the usury laws. *Allan v. M & S Mtg. Co.*, 138 Mich.App. 28, 39-40, 359 N.W.2d 238, 243 (1984).

29. A exception for "payday loans"—statutorily denominated "deferred presentment service transactions" by 2005 PA 244---applies to a specific type of transaction which is statutorily defined not to be a "loan" at all: on receiving an advance of money not to exceed $600, M.C.L. 487.2153(1) and not in excess of one open transaction, M.C.L. 487.2153(2), the customer provides a check post-dated by not more than 31 days for the full amount of the funds advanced plus a transaction charge, M.C.L. 487.2153(4)(b). Persons engaged in the business of deferred presentment transactions must be licensed by the state of Michigan. M.C.L. 487.2131(1). Plain Green is not licensed under the act, and Plain Green loans are ordinary installment loans payable over a period of months, usually 20-34 months, so this exception is likewise not available to defendants.

30. The charging of usurious interest bars the lender "from the recovery of any interest, any official fees, delinquency or collection charge, attorney fees or court costs", while the borrower is correlatively "entitled to recover his [her] attorney fees and court costs from the * * *

lender or assigns".  M.C.L. 438.32.

31.     Michigan's usury laws were thus designed to protect Michigan consumers from the very type of predatory lending scheme Defendants operated, which sought to evade state lending laws, including Michigan's, by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, ___ US ___, 134 S.Ct. 2024, 2052, 188 L.Ed.2d 1071 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders & Tribes: Are Both Tribal Sovereignty & Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 758-59 (2012)).

**B.     The rent-a-tribe model was developed to evade state usury laws, such as Michigan's, and to replace the no longer useful rent-a-bank model.**

32.     Predatory financial services, including high-interest installment loans and other debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account."[5] These types of debt traps "are heavily marketed to financially vulnerable consumers."[6]

33.     It is no secret that internet lenders "have a weak history of complying with state laws." Martin & Schwartz, *supra* at 764. Prior to the rent-a-tribe business model, some ultra-high interest lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[7]

---

[5] Payday, Vehicle Title, and Certain High-Cost Installment Loans, 131 Harv. L. Rev. 1852, 1852 (2018).

[6] See CFPB Finalizes Rule To Stop Payday Debt Traps, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. "A debt trap results when a borrower is repeatedly unable to repay a loan and must reborrow, paying additional fees each time." See Payday, Vehicle Title, and Certain High-Cost Installment Loans, *supra* note 1, at 1853.

[7] 3 See, e.g., Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest*

34.     To avoid state limits on interest rates, ThinkCash used a dodge known in the lending industry as "rent-a-bank", designed to take advantage of federal law which insulates banks from application of state usury laws by preemption: lenders prohibited by state laws from making usurious loans directly partnered with a bank, so the bank was the nominal lender, although the  non-bank lender would market, fund, and collect the loan, and related lending functions.

35.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and nearly eliminating them by 2010 by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n.16 (2012).

36.     The federal crackdown effectively ended the Kenneth Rees' rent-a-bank operation because Think Cash, a Rees-controlled entity, found its preferred bank, First Bank of Delaware, was effectively shut down by federal regulators in 2012, dissolved, and fined based on practices similar to those herein alleged.  *Gingras v Rosette* (No. 5:15-cv-101, USDC Vt., May 18, 2016)[8].

37.     In response  to  the  crackdown  on  rent-a-bank  arrangements,  predatory lenders,

---

*Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http:// www.consumerfed.org/pdfs/ paydayreport.pdf.

[8]  "These allegations are neither conclusory nor implausible. They are factually detailed—at least as detailed as is possible without the advantages of discovery. They include a description of a similar business venture involving Mr. Rees and the First Bank of Delaware which was dissolved following an FDIC enforcement action and consent decree concerning similar practices. *(Id.* ¶¶ 38-40.) They are consistent with similar allegations in a case brought by the Pennsylvania Attorney General's office against Think Finance, Inc. and other parties in the Eastern District of Pennsylvania. *See Pennsylvania v. Think Finance, Inc.,* No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016)."

including Think Finance and Kenneth Rees, reincarnated operations through associations with Native American tribes in an effort to avoid state laws by invoking tribal sovereign immunity. *Id*.; *see also* Martin & Schwartz, *supra* at ¶24.

38.     In these "partnerships", online lenders "register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." Johnson, *supra* ¶24, at 399 (footnotes omitted).

39.     A central feature of the rent-a-tribe business model is the choice-of-law provision used in the scheme's lending agreements. The non-tribal participants in the scheme will claim that they have no liability for their violations of state and federal laws because only tribal law applies to the loans. Such claims have been uniformly rejected by courts from a variety of jurisdictions across the country, thus demonstrating the illegality of the rent-a-tribe lending scheme, with multiple cases directly involving Plain Green, LLC or one or more of its affiliates or officers[9], or similar tribal entities from other tribes[10].

---

[9] *Gingras v. Think Finance, Inc*, ___ F.3d ___ (Nos 16-2019-cv(L), 16-2132-cv, 16-2135-cv, 16-2318-cv, 16-2140-cv(Con) (2nd Cir. April 24, 2019); *Gibbs v. Haynes Investments, LLC*, Civil Action 3:18cv48, US DC, E.D. Virginia, Richmond Division, March 22, 2019 (Virginia Class action held: may properly proceed in VA, no transfer to VT (*Gingras*), no arbitration); *Consumer Financial Protection Bureau (CFPB) v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) cert den ___ U.S. ___ (12/11/17); *CFPB v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018).

[10] ; *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *Pearson v. United Debt Holdings, LLC*, 123 F.Supp.3d 1070 (N.D.Ill. 2015); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v.*

**C.    Think Finance and Kenneth Rees developed the rent-a-tribe scheme to evade state usury laws, such as Michigan's.**

40.    Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. *See* Ex. 1.

41.    Under that arrangement, loans were originated in the name of First Bank of Delaware, but the bank served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. Ex. 1 at TF-PA-504641.

42.    In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans. Ex. 1 at TF-PA-504640.

43.    By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, *i.e.*, the third parties who invested money to allow Think Cash to grow the scheme. Ex. 1 at TF-PA-504640.

44.    In August 2010, the Federal Deposit Insurance Corporation took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist order directing FBD to terminate its relationship with "all third-party lending programs."  In response, Kenneth Rees, throughThink Finance, adapted his business model to use a tribal entity as a conduit for the loan. The purpose of adopting the rent-a-tribe model was to avoid banking regulatory issues and leverage Think Finance's existing sourcing, underwriting, and servicing platforms from the discredited rent-a-bank model.

45.    Think Finance identified state regulation, including interest rate caps and prohibitions on payday lending, to be their primary regulatory concern.

---

*Delbert Services Corp., supra*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No. 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018)

46.     Think Finance modeled their rent-a-tribe model after CashCall, Inc., which they identified as their main competitor, and Think Finance retained the same legal counsel used by CashCall to construct the tribal lending model, Claudia Callaway of KattenMuchinRosenman LLP, Washington, DC, who advertises herself as leader of the firm's "Platform Lending initiative".  https://www.kattenlaw.com/Claudia-Callaway

47.     Under its revised model, Think Finance uses a business entity organized under the laws of a Native American Tribe as the nominal lender to originate installment loans substantially similar in character and terms to those made under the rent-a-bank arrangement.

48.     Within a few days of origination, the loans are purchased by a limited partnership, GPL Servicing, Ltd. ("GPLS"), a Cayman Islands operative controlled by Victory Park Capital Advisers, a Chicago hedge fund,.

**D.  The role of GPL Servicing in the lending scheme.**

49.     As a part of its transition from the rent-a-bank model to the rent-a-tribe model, Think Finance created GPL Servicing.

50.     GPL Servicing is an employee-less, Cayman Islands limited partnership, which purchases a 99% participation interest in the loans made by Plain Green (or other tribal entity) within a few days of origination.

51.     According to Think Finance itself, GPL Servicing was created "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Fin., LLC*, Case No. 17-03 106 (Bankruptcy. N.D. Tex.) (Dkt. 1, Compl. at ¶24) (explaining the creation of GPLS).

52.     With the assistance of Victory Park, "GPLS raised money from investors," and these funds were then used to expand the portfolios of Plain Green and its Otoe-Missouria tribal

counterpart, Great Plains. LLC. *See, e.g., Think Fin., LLC*, Case No. 17-03 106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 25.

53.     As a part of this process, both Plain Green and Great Plains entered into a "Participation Agreement" with GPLS, which established GPLS's right to purchase an "undivided ninety-nine percent (99%)" interests in the loans, "including any income or profits therefrom and the applicable Loan Documents." Ex. 2 at § 2(a).

54.     The participation interests were sold to GPLS at "book value" within two days of the origination of the loan. Ex. 2 at § 2(b).

55.     As a result of the purchase, GPLS was "considered for all purposes as, the legal and equitable owner" of the interest in each loan "and the associated Loan Documents... together with all of the rights, privileges and remedies applicable thereto." Ex. 2 at § 2(c).

56.     In return for the use of its name on the loans, the tribal entity would receive a nominal fee. For example, Plain Green receives a "Service Fee" of 4.5%. Ex. 6 at 3.

57.     Through a separate agreement entitled "Administrative Agency Agreement," GPLS retained a Think Finance subsidiary, TC Administrative Service, as "the exclusive provider of the administrative services" for the loans. *See generally* Ex. 3.

58.     TC Administrative received an "Agent Fee," which was defined as "the interest and fees received on the Purchased Loans during such months," as well as the "principal collected in such month on Purchased Loans that were Non-Current Purchased Loans in the prior month." Ex. 3 at 2.

59.     TC Administrative's fee was reduced by: (1) a 20% "Fixed Return" of the outstanding principal amount loaned by GPLS, and (2) any and all expenses incurred by GPLS, "including, but not limited to, the Revenue Share paid to [Great Plains] for such months"

pursuant to the Participation Agreement. Ex. 3 at 2.

**E.      Think Finance solicited the Chippewa Cree Tribe to form Plain Green in furtherance of the rent-a-tribe scheme.**

60.      On March 11, 2011, Think Finance, the Chippewa Cree Tribe, Victory Park (through its ownership of GPLS), and Haynes Investment entered into the initial term sheet for a separate rent-a-tribe venture.

61.      Consistent with the rent-a-bank arrangement, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing service support" for consumer loans ostensibly in the name of the Chippewa Cree Tribe. Ex. 6 at 1.

62.      In return, the Chippewa Cree Tribe agreed to commit "its best efforts" to complete certain "critical path items" within 14 days, including forming Plain Green, revising the Tribal Transaction Code to allow for the arrangement's lending products, setting up bank accounts and ACH processing for Plain Green, and obtaining separate originating and servicing addresses for Plain Green. Ex. 6 at 3.

63.      In return for the use of its name, Plain Green received "4.5% of cash revenue received" on the loans, as well as reimbursement for expenses. Ex. 6 at 3.

64.      The Chippewa Cree Tribe was not required to contribute any of its own money to fund the loans or operations. Ex. 6 at 1.

65.      In New York, a state agency issued a cease and desist order to one such tribe, which after suit in federal court was upheld on appeal by the US Court of Appeals for the 2nd Circuit in *OtoeMissouria Tribe v. N.Y. Dep't of Fin. Servs*., 974 F.Supp.2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

66.      On September 30, 2013, the Southern District of New York denied the tribe's

request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Great Plains was "subject to the State's non-discriminatory anti-usury laws." *Id*. at 361.

67.     The district court further reasoned, "There is simply no basis * * * that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id*.

68.     In its decision affirming these rulings, the Second Circuit noted that "a tribe has no legitimate interest in selling an opportunity to evade state law." 769 F.3d 105, 114 (2d Cir. 2014), citing *Washington v. Confederated Tribes*, 447 U.S. 134 (1980).

69.     The Second Circuit further explained that "[m]uch of the commercial activity at issue takes place in New York. That is where the borrower is located; the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation" and that "collection clearly takes place in New York." *Id*. at 115.

**F.     Defendants received unlawful interest and principal on the void loans.**

70.     Through their positions with Plain Green, Defendants participated in the collection of usurious loans in Michigan.

71.     Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 25% APR, with a base rate of 356% (Exhibit A, Plain Green advertising flyer mailed to Plaintiff Swiger, p. 3).

72.     The actual interest rate charge to plaintiff Swiger is 354.14% APR (Exhibit B, p. 3, Loan Amortization Table).

73.     Neither Defendants nor any of the other participants in the lending scheme had a Michigan license permitting them to make loans or "deferred presentment service transactions"

16

charging interest in excess of 25% APR, nor , on information and belief, did they ever attempt to obtain such a license.

74.     Accordingly, the loan to Plaintiff Swiger is usurious, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any interest or charges on the loans, including the amounts paid by Plaintiff. M.C.L. 438.32.

75.     Defendants and their co-conspirators have to date received $1,170.54 from Ms. Swiger as a result of the usurious loan to her of $1200, and claim the balance due on Ms. Swiger's loan is $1,922.37 (Exhibit E), which means 100% of payments to date have been applied solely to interest and fees (see Exhibit B, p. 4, "Payments") leaving a claimed balance in excess of 150% of the original loan amount after payment of .97545% of loan principal in less than seven (7) months.

76.     Through their participation in the enterprise, Defendants received amounts collected from Plaintiff and the class members' loans in excess of what could be lawfully charged or collected under Michigan law.

77.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

78.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

79.     354.14% (Exhibit B), as well as 356% (Exhibit A) is more than twice the Michigan maximum legal rate of 25%; it is, in fact, as a matter of simple arithmetic, more than 14 times the legal 25% rate.

80.     Defendants charged an interest rate far in excess of the enforceable rate

established by Michigan law, and thus, Defendants violated RICO's prohibition against the collection of unlawful debt, 18 U.S.C. § 1962(c).

81.     As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

82.     Plaintiff Nicole Swiger fell victim to a sophisticated loan sharking operation that was specifically designed by the Defendants to ensnare unsuspecting victims.

83.     Defendants initiated their approach to Ms. Swiger, whom their connection with ThinkFinance (identified in detail below, ¶¶101-108, 115, 117-118) had identified as a prospective target, by sending her an unsolicited e-mail telling her she could have $1200 in her bank account the next day just by going online.

84.     Ms. Swiger was thus induced to visit a bright and cheerful website, https://www.plaingreenloans.com, which promised to help her secure a loan overnight.

85.     This website informs visitors that with an easy, online application, they can obtain an answer within a matter of seconds:

# Extra Cash to Help
# When the Bills Pile Up.
### Fast. Convenient. Confidential. Secure.

Apply Online  >

The process is quick and easy with no hidden fees.

86.     The ease and simplicity of applying for a loan is emphasized on the website:

## Get up to $1,000 in three easy steps.
**Returning customers can get up to $3,000.**

**1. APPLY ONLINE**
It only takes a few minutes to apply; it's quick, easy and completely confidential. Simply fill out the information and submit your application to find out if you're approved. Loan cost and terms
**2. GET APPROVED**
Get an answer in seconds. You don't have to spend time worrying, waiting, or wondering. You'll find out if you are approved and for what amount quickly.
**3. GET FUNDED**
You can have your money as soon as the next business day (for transactions completed by 5:45 p.m. ET). Applications received after 5:45 p.m. ET are processed the following business day. Read how it works >>[11]

87.     Ms. Swiger, after borrowing $1,200, then received a colorful flyer in the mail (Exhibit C), reciting the loan amount, annual percentage rate (356%), bi-weekly payment amount ($167.22), first payment due date (12/28/2018), and loan maturity date (04/03/2020), positioned below an assurance affirming that

You made the right choice.  We're committed to customer care.

88.     The flyer (Exhibit C) includes 3 payment coupons with Ms. Swiger's name and address printed in the upper left-hand corner, with a mailing address for a post office box inexplicably in Philadelphia, Pennsylvania, the addresses positioned to fit neatly in a #10 double window envelope.

89.     While the flyer (Exhibit C) has bright green headings in 18 point type, and main text in 12 point type, crucial information regarding Plain Green as a tribal lender and the loan as "an expensive form of credit" is presented in 8 point type.

90.     The Plain Green enterprise was created when Kenneth Rees, the mastermind of this rent-a-tribe scheme, had his former business, ThinkCash, shut down by federal regulators.

---

[11] On the website, these 4 items are displayed on the same horizontal level; undersigned counsel are unable to duplicate the websie appearance at their level of technological expertise.

Undeterred, Rees sought a new way to prey on the necessitous borrowers he was accustomed to fleecing, and Rees saw tribal immunity as the answer to his problem.

91.     Rees and his rebranded company, Think Finance, approached the Chippewa Cree Tribe with a proposition: Rees and Think Finance would provide everything the Tribe needed to run a successful ultra-high interest loan enterprise in exchange for the Tribe's immunity in order to stymie state and federal regulators, with the Tribe receiving 4.5% of the revenues and the remaining 95.5% left to Rees and his entities to enjoy (Exhibit D,. 2 "Revenues").

92.     The concept behind the "rent-a-tribe" scheme is to take advantage of tribal immunity in the same way that ThinkCash  used federal bank preemption to avoid state usury laws until federal regulators stopped the gravy train; under the new scheme, the loans are made in the name of a lender affiliated with the tribe, but ThinkCash/Think Finance or its affiliate Haynes Investments, Inc. provides the marketing, funding, underwriting, and collection of the loans, and the proprietary software to control everything (Exhibit D, p. 1 "Transaction" ¶¶1, 4, p. 2 "Mechanics").

93.     Using the "rent-a-tribe" scheme, ThinkCash/Think Finance exploits its customer base to generate new loans. The first "rent-a-tribe" scheme ThinkCash/Think Finance started involved Plain Green.

94.     ThinkCash/Think Finance transferred its existing loan portfolio and customer database to Plain Green, and also designed the web platform used by Plain Green so that existing ThinkCash/Think Finance customers visiting the ThinkCash/Think Finance website are routed automatically to the Plain Green website.

95.     Defendants Rees and Think Finance, in combination with Defendants Rosette, Whitford, and Mcinerney, have structured various contractual evasions to keep these usurious

practices from review, including phony choice of law provisions and assertions of tribal sovereign immunity.

96.    In some cases, Defendants Rees and Think Finance, in combination with Defendants Rosette, Whitford, and Mcinerney, have blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what payments have been credited to their accounts, the principal balance remaining, or access copies of the loan documentation

97.    Defendants Rees and Think Finance, in combination with Defendants Rosette, Whitford, and Mcinerney, also mislead target borrowers that Plain Green loans are intended to be short term loans, *e.g.*, by advertising that "Plain Green loans are designed to help you meet your emergency borrowing needs", when the associated loan repayment schedules run for periods of a year or more.

98.    Rees and Think Finance, in combination with Defendants Rosette, Whitford, and Mcinerney, regularly report loan information to credit rating agencies without disclosing the illegal nature of the loans, and similarly report to credit rating agencies when borrowers fail to make payments on illegal loans.

99.    An outstanding balance remains on Ms. Swiger's loan.

100.    Ms. Swiger is suffering irreparable injury because, if she pays off the loan including usurious interest, no part of her payments will be recoverable, as Plain Green will claim tribal immunity.

101.    Yet Ms. Swiger suffers ongoing  irreparable injury because her loan continues to be reported to credit rating agencies as a legitimate and open loan, which negatively impacts her ability to obtain financing from other lenders who operate within the law.

102.    Ms. Swiger has suffered and will continue to suffer these injuries due to the

illegal conduct of the Defendants described in this Complaint.

103.    A declaratory judgment that the loans are illegal, that interest payments must be credited against principal, and an injunction ordering Defendants to correct their statements to credit agencies concerning the legal nature of these loans and to stop defaming the credit of Ms. Swiger will alleviate the harm.

104.    Defendants Rosette, Whitford, and Mcinerney required Nicole Swiger to agree to ACH withdrawals from her bank account in connection with the loan to her (Exhibit B, p. 7).

105.    Defendants Rees and Think Finance, with the assistance of Defendants Rosette, Whitford, and Mcinerney and the computer software used to control all Plain Green loan transactions,  thus obtained automatic access to plaintiff's bank account and continued to withdraw money from her account even after they had recouped the full principal and a reasonable amount of interest.

106.    Nicole Swiger has never traveled to, visited, set foot upon, or even seen the Rocky Boy's Reservation; she applied for her Plain Green loan from her residence in Westland, Michigan.

107.    Defendants Rees and Think Finance, through their arrangement with Defendants Rosette, Whitford, and Mcinerney, then wired the money into Swiger's Michigan bank account.

108.    Defendants Rees and Think Finance, with the assistance of Defendants Rosette, Whitford, and Mcinerney, then periodically withdrew money from plaintiff's Michigan bank account by ACH (Automated Clearing House) withdrawals.

109.    None of Plain Green's loan activity actually occurs on the Rocky Boy's Reservation; Plain Green uses third parties to carry out all necessary administrative tasks off the reservation.

### G. Class Action Allegations

110.    **Class definition.**  Pursuant to Rule 23 of the Federal Rules of Civil Procedure,

Plaintiff brings this claim for herself and on behalf of a class initially defined as:

> All consumers residing in or visiting within the boundaries of Michigan when they
> entered into a loan agreement with Plain Green, LLC during the limitations period
> applicable to each claim.

111.    **Numerosity. F.R.Civ.P. 23(a)(1).** Although  the exact number of class

members is currently unknown to plaintiff, it is determinable with precision from records

maintained by Plain Green, Think Finance, and the individual defendants.

112.    Based on the revenue collected by defendants from consumers, numerosity is

easily satisfied, as reflected in footnotes 1 and 2 above (p. 4), and the number of class members

is so large that joinder is impracticable.

113.    Additionally, the names and addresses of the class members are identifiable

through the internal business records maintained by Plain Green, Think Finance, and the

individual defendants, and the class members may be notified of the pendency of this action by

published, mailed, and/or e-mailed notice.

114.    **Predominance of Common Questions of Law and Fact. F.R.Civ.P.. 23(a)(2).**

Common questions of law and fact exist as to all members of the putative class, and there are no

significant factual or legal issues that differ between the putative class members.

115.    These common questions predominate over any questions affecting only individual

class members, including:

a. whether a racketeer-influenced enterprise existed;

b. whether Defendants received income derived from the collection of unlawful interest;

c. whether Defendants used or invested all or any part of that income to acquire an interest

in, to establish, or to operate the enterprise; and

d. the proper remedies for Plaintiff and the class members against the Defendants, jointly and severally.

116.    **Typicality. F.R.Civ.P.. 23(a)(3).** Plaintiff Swiger's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same legal theory as the other members of the putative class. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members'.

117.    **Adequacy of Representation. F.R.Civ.P.. 23(a)(4).** Plaintiff is both a member of the class and an adequate representatives of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class that she seeks to represent.

118.    Plaintiff has retained counsel competent and experienced in such litigation, and intends to continue to prosecute the action vigorously.

119.    Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class; neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

120.    **Superiority. F.R.Civ.P.. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.

121.    The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them.

122.    Even if the members of the class herself could afford such individual litigation, it

would be an unnecessary burden on the Courts.

123.    Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system needed to resolve the legal and factual issues raised by Defendants' conduct.

124.    The prosecution of separate actions by individual members of the Class would create a risk that adjudications with respect to individual members would, as a practical matter, be dispositive of the interests of the other members who are not parties to the individual adjudications, or it would substantially impair or impede the class members' ability to protect their interests.

125.    The Class is readily definable and is one for which records should exist.

126.    Prosecution of class member claims as a class action will eliminate the possibility of repetitious litigation. Treatment of the controversy as a class actiThe Class is readily definable and is one for which records should exist. Prosecution of class member claims as a class action will eliminate the possibility of repetitious litigation.

127.    By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proofs in this case.

128.    **Injunctive Relief Appropriate for the Class. F.R.Civ.P.. 23(b)(2).** Class certification is appropriate because Defendants acted in ways generally applicable to the class, making appropriate injunctive relief with respect to Plaintiff and the class members.

129.    Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any proceeds arising from the collection of unlawful debt; prohibiting Defendants from continuing to engage in the enterprise or selling the outstanding balances on the loans to

any third parties, and requiring Defendants to recall, cancel, correct, or otherwise remediate any adverse reports to credit reporting agencies relating to loan defaults or other claimed borrower deficiencies arising from usurious loans.

## COUNT ONE:
## VIOLATION OF RICO, 18 U.S.C. § 1962(a)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

130.   Plaintiff restates each of the allegations in paragraphs 1-129 as if set forth at length herein.

131.   "Collection of unlawful debt" is one of the specific offenses which may give rise to civil liability under RICO; "unlawful debt" is defined in 18 U.S.C. §1961(6) as:

> a debt * * * (B) which was incurred in connection with * * * the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

132.   All of the loans made to Michigan residents included an interest rate far in excess of twice the enforceable rate in Michigan (see ¶¶78-80 above), and thus, the loans constitute "unlawful debt" under RICO, 18 U.S.C. § 1961(6).

133.   As alleged above, Defendants violated RICO, 18 U.S.C. § 1962(a) through the receipt of income derived, directly and indirectly, through collection of unlawful debt, and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the felonious enterprise.

134.   Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

135.   Plaintiff and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and

participation in the enterprise.

136.     Accordingly, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

137.     Plaintiff restates each of the allegations in paragraphs 1-129 as if set forth at length herein.

138.     As alleged above, Defendants violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt (see ¶¶78-80 and 131-132 above).

139.     Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

140.     Plaintiff and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

141.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

142.     Plaintiff restates each of the allegations in paragraphs 1-129 as if set forth at

length herein.

143.  RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6); see also ¶¶78-80, and 131-132 above).

144.  All of the loans made to Michigan residents involved an interest rate far in excess of twice the enforceable rate in Michigan.

145.  This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Michigan consumers.

146.  Plaintiff and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by Defendants.

**COUNT FOUR:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

147.  Plaintiff restates each of the allegations in paragraphs 1-129 as if set forth at length herein.

148.  As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(a) and (c), as evidenced by their agreement to provide millions of dollars of financing for the loans with the knowledge that the loans would be made in violation of state usury and licensing laws, including Michigan's.

149.  Plaintiff and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

## COUNT FIVE:

### RELIEF UNDER M.C.L. 438.32
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

150.  Plaintiff restates each of the allegations in paragraphs 1-139 as if set forth at length herein.

151.  All of the loans made to Michigan consumers in the name of Plain Green involved interest rates above 25%.

152.  As explained above (¶¶70-76, *inter alia*), Defendants each received, directly or indirectly, revenues collected on the loans.

153.  Plaintiff paid interest in excess of that permitted by Michigan law.

154.  Accordingly, Plaintiff and the class members are entitled to recover all interest, official fees, and delinquency or collection charges obtained by Defendants, and plaintiff is entitled to recover her own and the class members' attorney's fees and costs. M.C.L. 438.32

### COUNT SIX:
### UNJUST ENRICHMENT
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

155.  Plaintiff restate each of the allegations in paragraphs 1-129 as if set forth at length herein.

156.  All of the loans to Michigan consumers in the name of Plain Green were usurious, violative of RICO, and thus void and unenforceable.

157.  Plaintiff and class members conferred a benefit on Defendants when they paid usurious interest on the loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the usurious loans.

158.  Accordingly, Plaintiff and the class members are entitled to recover all interest,

29

official fees, delinquency or collection charges obtained by Defendants and plaintiff is entitled to recover her own and the class members' attorney's fees and costs. M.C.L. 438.32

## COUNT SEVEN

## DECLARATORY JUDGMENT THAT ARBITRATION CLAUSES IN PLAIN GREEN'S LOAN DOCUMENTS ARE VOID AND UNENFORCEABLE

159.  Plaintiff restate each of the allegations in paragraphs 1-129 as if set forth at length herein.

160.  A device that Defendants have employed to try to avoid legal liability is an arbitration agreement (Exhibit B, pp. 8-9).

161.  That arbitration agreement is unenforceable because it is unconscionable and its supposed remedy illusory, because, although the arbitration agreements references the Federal Arbitration Act as something to which the parties "will look" (Exhibit B, p. 9, ¶2), it is "Tribal Law" that governs (*id.*)[12], the agreement does not waive and attempts to preserve tribal immunity, purporting to give Defendants the ability to void any arbitration award by simply asserting tribal immunity *after the fact*, or submitting the arbitrator's decision to *de novo* review in a tribal court (*id.*), and also by concealing prohibited waiver of federal and state statutory rights under the guise of a choice of laws clause (*id.*). *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir.2017), citing *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675 (4th Cir. 2016)

162.  Because the arbitration agreement provides a remedy that is entirely illusory, , the

---

[12] In fact, the Chippewa-Cree Law and Order Code  (1987), available at http://indianlaw.mt.gov/ Portals/127/chippewacree/codes/law_order_code_1987.pdf, does not contain any word commencing with the letters "arbit".  The Chippewa-Cree Tribal Ordinances (1939-1999), viewable at http://indianlaw.mt.gov/Portals/127/chippewacree/codes/tribe_ordinances_39_99.pdf contains only "arbitrary" (p. 44) as the single exemplar of a word starting with "arbit".

agreement is unconscionable, unenforceable, and void in its entirety.  *McDonald v. CashCall, Inc.*, 883 F.3d 220, 232 (3rd Cir.2018); *Parnell v Western Sky Financial, LLC*, 664 Fed.Appx. 841, 843-844 (11th Cir.2016), citing *Parm v. National Bank of California*, 835 F.3d 1331, 1334-38 (11th Cir. 2016); *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 768 (7th Cir.2014).

163.   There are several additional indications that the agreement is unconscionable, including the following:

a. Because the monetary damages suffered by each Plaintiff and other members of the Class is small, the individual incentive to bring an action is extremely limited, particularly since Plain Green targets people who have few resources to bring a claim;

b. The doctrine of tribal immunity is a complicated legal doctrine with which the vulnerable people in the plaintiff Class are unfamiliar;

c. The terms of the purported contract are not easily discovered on the Plain Green website and, worse, the terms of the agreement change from the time when a person applies for a loan to when the terms are presented after the application process is complete as an adhesive proposal (take it or leave it);

d. The parties also have a great imbalance in negotiating leverage as well as contractual sophistication—defendants routinely employ highly paid attorneys from major law firms, such as Pepper Hamilton LLP (Philadelphia, Detroit, and 12 other offices) and Hogan Lovells US LLP (London, Washington DC, New York City, among its 49 offices) representing them in litigation (see Exhibit D, p. 3 "Legal Representation, providing that ThinkFinance will not only furnish such counsel but pay for counsel), while plaintiff and class members can employ counsel only on a contingency fee basis, and cannot even advance the costs of filing suit;

e. The arbitration agreement has a provision for shifting costs (Exhibit B, p. 8 "What

Arbitration Costs"), which discourages borrowers from filing low dollar claims;

f. Defendants will agree to have arbitration in a location convenient to the borrower's residence only if the borrower reaffirms that tribal immunity applies (Exhibit B, p. 8, "Location of Arbitration"), further disadvantaging borrowers who have neither familiarity with nor ready access to Montana legal counsel, still less to Montana attorneys familiar with Tribal Law and working from offices located close to the Rocky Boy's Reservation, a 171.4 sq. mi. area in North Central Montana, a state comprising 147,040 sq. mi; according to Google Maps, the main reservation community, Box Elder, is 102 miles (1 hr. 46 min.) from Great Falls, the nearest city of any size (population 58,368 per 2017 census estimate).

164.  Reliance on tribal courts or tribal arbitrators is fraught with unfairness, as the tribe has been in flux—for example, its last tribal chairman, Ken Blatt-St. Marks, was dismissed by the tribal Business Committee, headed by Ricky Morsette, at least 4 times between 2013 and 2018, being reinstated one time (on April 24, 2015) by the Interior Department on grounds St. Marks was protected by federal whistleblower laws, with Interior further ruling the tribal Business Committee's charges against Blatt-St. Marks were a pretext.

165.  Before he was removed, Blatt-St. Marks fired then acting Chief Judge Micelle Breaux and unilaterally appointed Duane Gopher, while also terminating additional judges of the Tribal Court.  (The tribe's current chairman is Harlan Baker.)

166.  Widespread corruption has gripped the Tribe; for example, John Chance Houle (former chairmen of Plain Green and at the time a member of the tribe's Business Committee), Tony James Belcourt, Tammy Kay Leischner, James Howard Eastlick, Mark Craig Leischner, and Haily Lee Belcourt were charged in a 17 count indictment unsealed on April 18, 2013, charging embezzlement and other crimes relating to the spending of federal funds appropriated

for the tribe by the American Recovery and Reinvestment Act of 2009 ("ARRA").

167.  Tony James Belacourt, as an agent of the tribal government (CEO of the Chippewa Cree Construction Company), pled guilty to embezzlement of federal funds, Tammy Kay Leischner pled guilty to theft from an Indian Tribal Government receiving federal funds, and James Howard Easterlick pled guilty to the same offense.

168.  In separate cases, John Chance Houle pled guilty to embezzling funds from the Chippewa Cree Rodeo Association, to theft from an Indian tribal organization, obstruction of justice, and impeding a grand jury.

169.  The corruption extends to Plain Green—in an arbitration involving Plain Green, the arbitrator found that its former Chief Executive Officer, Neal Rosette, and former Chief Operating Officer, Billi Anne Morsette, were involved in a fraudulent kick-back scheme with entity called Encore Services, LLC ("Encore"), which manages the lending business.

170.  In the scheme, Encore charged a 15% management fee of all gross revenues of the tribal online lending business, but immediately kicked back 5% of those revenues to Rosette and Morsette.

171.  Encore was indicted in 2016 (along with Zachary Brooke Roberts, Martin Gasper Mazzara, and Richard Lee Broome) for conspiracy to commit wire fraud, 18 USC §371, conspiracy to commit money laundering, 18 USC §1956-4601, and numerous additional charges ultimately dismissed as part of a plea bargain, with  Neal Rosette, Billi Anne Morsette, John Chance Houle, Anthony "Tony" Belcourt, Bruce Sunchild, Shad Huston, and James Eastlick, Jr. named as unindicted co-conspirators, *United States v. Encore Services, LLC*, USDC Mont. No. CR-16-19-GF-BMM.  The upshot of that prosecution was that Encore plead guilty and was required to pay restitution of $2.5 million after sentencing on August 24, 2017.

172.    Multiple federal courts have ruled that Plain Green's arbitration agreement, or an equivalent agreement involving other tribal lending entities, is unconscionable and unenforceable, including most recently the US Court of Appeals for the 2nd Circuit in *Gingras v Think Finance, Inc*, ___ F.3d ___ (Nos 16-2019-cv(L), 16-2132-cv, 16-2135-cv, 16-2318-cv, 16-2140-cv(Con), 2nd Cir. April 24, 2019), the Eastern District of Virginia in *Gibbs v. Haynes Investments, LLC*, (Civil Action 3:18cv48, USDC E.D. Va, Richmond Div., March 22, 2019); the Northern District of Illinois in *Pearson v. United Debt Holdings, LLC*, 123 F.Supp.3d 1070 (N.D.Ill. 2015).  See also the authorities cited in ¶¶161-162 above.[13]

173.    Plaintiff and the class accordingly request that this Court declare Plain Green's arbitration clause unconscionable, unenforceable, illusory, and void.

**COUNT EIGHT**

**VIOLATION OF THE
ELECTRONIC FUNDS TRANSFER ACT (EFTA), 15 U.S.C. §§1693 *et seq*.**

174.    Plaintiff reasserts and incorporates by reference paragraphs 1-129.

175.    The EFTA creates a "framework[of] rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15 U.S. C. § 1693(b).

176.    The Act applies to electronic fund transfers from a "consumer account", which is defined as a "demand deposit, savings deposit, or other asset account." *Id*. § 1693a(2).

177.    The EFTA specifically authorizes private lawsuits, including class action lawsuits as ruled appropriate by the courts hearing those cases. 15 U.S.C. § 1693m(a).

---

[13] Before any of the Circuit decisions ruling such arbitration clauses invalid, this Court (Chief Judge Edmunds) made a contrary ruling in *Narula v Delbert Services Corp.* (No 2:13-cv-15065, USDC E.D. Mich S.D., July 39, 2014).  That ruling was not precedential and, in light of the subsequent case law development on the question, is also not persuasive.  *Narula* is cited to fulfill counsel's duty of candor under MRPC 3.3.

178.    Congress included a specific statement that the primary objective of EFTA "is the provision of individual consumer rights." *Id*. § 1693(b).

179.    Defendants violated § 1693k(l) by conditioning the extension of short-term credit to Plaintiff and class members on borrowers' authorization of electronic fund withdrawals from their accounts as the mandatory method of making repayment.

180.   Defendants are "persons" as defined in Section 1005.2(j) of Regulation E, 12 C.F.R. § 1005.2(j).

181.   Section 913(1) of EFTA, 15 U.S.C. § 1693k(1), provides that no person may condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers.

182.   Part 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1), provides that "No * * * person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account."

183.    The Official Interpretation of Regulation E, Section 1005.10(e)(1), 12 C.F.R §1005.10(e)(1)-1, Supp. I, provides that creditors may not require repayment of loans by electronic means on a preauthorized recurring basis.

184.   In numerous instances, in connection with offering payday loans to consumers, Defendants have conditioned the extension of credit on recurring preauthorized electronic fund transfers, thereby violating Section 913(1) of EFTA, 15 U.S.C. § 1693k(1), and 12 C.F.R § 1005.10(e)(1).

185.   Defendants' violations of the EFTA are ongoing.

186.   As a result of Defendants' violations of the EFTA, Plaintiffs were damaged by having usurious interest directly withdrawn electronically from their bank accounts by defendants.

187.   Plaintiff and class members would not have had their bank accounts debited with illegal ACH transactions in excess of any legal amount of interest but for Defendants Rees and Think Finance establishing and running the corrupt enterprise of Plain Green.

188.   Accordingly, on behalf of herself and all other Michigan consumers similarly situated, Plaintiff seeks to recover from Defendants, jointly and severally, all non-principal amounts electronically paid on any loans with Plain Green, LLC.

## COUNT NINE

### VIOLATION OF THE
### MICHIGAN CONSUMER PROTECTION ACT, M.C.L. 445.901 *et seq*.

189.   Plaintiff reasserts and incorporates by reference paragraphs 1-129.

190.   "The Michigan Consumer Protection Act (MCPA), MCL 445.901 *et seq.*, prohibits 'unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce[.]' " *Gorman v American Honda Motor Co, Inc*, 302 Mich.App. 113, 128; 839 N.W.2d 223 (2013), quoting MCL 445.903(1).

191.   As part of their scheme to evade Michigan's usury law, Defendants concocted loan documents (Exhibit B) containing arbitration and other contract clauses that refer to non-existent or inaccessible tribal arbitration rules and facilities, or to tribal laws which under established law have no application outside the boundaries of a tribe's reservation and no application to person who are not Indians or tribal members, which clauses would, by their terms, cause borrowers to waive a panoply of state and federal statutory rights or benefits not clearly stated in the contract, contrary to law and in violation of MCL 445.903(1)(t).

192.     As part of their scheme to evade Michigan's usury law, Defendants concocted loan documents (Exhibit B) containing clauses referring in broad terms to tribal law and tribal sovereignty, but without explaining the important details and limitations of such concepts, which are wholly foreign to the necessitous borrowers who form the plaintiff consumer class and who are unable to understand without mentoring and lengthy explanation the subtleties and nuances of dealing with tribal enterprises, contrary to MCL 445.90(1)(x).

193.     As part of their scheme to evade Michigan's usury law, Defendants concocted loan documents (Exhibit B) providing for interest at a rate grossly in excess of the rate at which similar services are provided, contrary to MCL 445.903(1)(z).

194.     Plaintiff and class members, proceeding under M.C.L. 445.911, seek

a.   a permanent injunction barring defendants, and any entity they may operate or control, from further violations of the MCPA, M.C.L. 445.911(1)(b) and (3)(c);

b.   an order striking or limiting the application of unconscionable clauses of contracts under MCL 445.911(4);

c.   appointment of a receiver to avoid or reverse any fund or asset transfers by one or more defendants to the Cayman Islands or other place to which the process of this Court does not extend (MCL 445.911(4));

d.   require defendants to bear the expense of notice to class members (which will also protect class members' rights of privacy) as authorized by MCL 445.911(5)

## COUNT TEN

## QUO WARRANTO

195.  Plaintiff reasserts and incorporates by reference paragraphs 1-129.

196.  In Michigan, as held in *Attorney General v. Contract Purchase Corp.*, 327 Mich.

636, 642, 42 N.W.2d 768 (1950):

> Quo warranto is an appropriate proceeding to remedy the usurpation of corporate franchises and the abuse, misuse or nonuse of franchises or powers by an existing corporation. * * * A finding that the violations charged are established by the evidence may result in rendition of a judgment ousting and altogether excluding the corporation from its corporate rights, privileges and franchise; or in lieu thereof, * * *; or the ouster, instead of being general, may be from doing particular acts. * * * We must determine whether the testimony establishes offenses against the laws and policy of this State.

197.   Plaintiff and class members seek leave of this Court, as required by Michigan Court Rule 3.306(B)(2), to institute quo warranto to prohibit the defendants, in any current or future corporate form, from doing any kind of lending business in Michigan.

198.  In light of the allegations in ¶¶138-141, 143-146, 148-149, 151-154, 1566-158, and 190-193 of this Complaint, defendants have violated the usury and consumer protection laws of this State.

199.  Such violations of Michigan's usury and consumer protection laws justify the use of quo warranto to oust corporate defendants, and individual defendants who have shown a proclivity to form new entities whenever one corporate or entity-type enterprise runs afoul of state or federal regulatory authorities or comes under scrutiny in a class action or administrative proceeding, from continuing to exercise corporate rights in this state, and to enjoin them from creating new entities to pick up where their predecessors have been barred from the state. *Attorney General v Diamond Mtg. Co.*, 414 Mich 603, 622, 327 NW2d 805 (1982).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court enter judgment on behalf of herself and the class she seeks to represent against Defendants for:

A.      Certification for this matter to proceed as a class action;

B.      Declaratory, injunctive, and damages relief as pled herein;

38

C.      Attorney's fees, litigation expenses, and costs of suit; and

D.      Such other or further relief as the Court deems proper in law or equity.

**TRIAL BY JURY OF ALL ISSUES SO TRIABLE IS DEMANDED**

Respectfully submitted,
/s/ *Nicole Swiger*,
Nicole Swiger
Plaintiff

/s/ *Henry Baskin*
Henry Baskin
The Baskin Law Firm, PC
Attorney for Plaintiff and Plaintiff Class
355 S. Old Woodward Ave., Suite 100
Birmingham, MI 48009
(248) 646-3300
hbaskin@baskinlawfirm.com
P10520

/s/*Allan Falk*
Allan Falk
Allan Falk, PC
Attorney for Plaintiff and Plaintiff Class
2010 Cimarron Dr.
Okemos, MI 48864-3908
(517) 381-8449
falklaw@comcast.net
P13278